# IN THE MATTER OF THE PETITION OF JOAQUIM GOMES DA SILVA FOR NATURALIZATION.

## August 29, 1913.

*Aliens—Naturalization—Qualifications—Conflict between applicant's religious beliefs and possible civic duties:* An applicant for naturalization is not disqualified for citizenship by reason of religious scruples against war or against the taking of life in defense of country,—in view of the exemption extended by Congress, 32 Stat. 775, to adherents of religions teaching such scruples.

*Naturalization*: Hearing on petition.

*R. W. Breckons,* U. S. District Attorney, for the United States.

*Joaquim Gomes da Silva,* petitioner, *pro se.*

CLEMONS, J.   At the hearing on this petition for naturalization, it appeared that the petitioner was a Seventh-Day Adventist and reluctant, if not opposed, to doing jury duty on Saturday, and also opposed to capital punishment and to the taking of human life even in defense of one's country,—though in the latter regard his opposition was rather to personal service in an army enlisted to destroy life if necessary, than to such service by others of his countrymen who had no conscientious scruples in the matter.

The petitioner in his brief insists that in spite of his own scruples of conscience and their possible conflict with civic duties, he is entitled to naturalization.   He affirms, "I shall do everything to uphold and defend the Constitution and all constitutional laws of the United States on any and every day of the week, provided, however, that by so doing my natural and inalienable right to worship God according to the dictates of my own conscience is not lost but vindicated," and he argues, that as under Article VI of the Constitution, no religious test may be required as a qualification for any office "on this ship of State," so much the less is "a common fellow passenger" required to submit to any religious test; and that questions as to his willingness to perform jury duty on his Sabbath-day, or to take life in defense of the country, are as improper as would be questions directed to a Presbyterian's scruples against Sunday labor or a Hebrew's scruples against pork as a food or a Roman Catholic's scruples against eating beef on Fridays.

The observation is made in argument that: "What the learned district attorney, . . . has sought to interject into this controversy is the matter of the conscience of this

petitioner as to whether wars are right or wrong. This question is not embraced within the naturalization laws and there is no requirement therein that an applicant for citizenship or naturalization shall promise to be ready to enlist in the army or navy of the United States. If such were the case, women would be debarred from citizenship, as would men too old to serve in the army or navy." The petitioner asks, should "many good American citizens, to the manor born, and others who have been naturalized and proven good and worthy citizens," and who "are as opposed, on religious convictions, to war as I am," be "deemed traitors to their country, or be deprived of their citizenship?" And he calls attention, also, to the fact that under 32 Stat. 775, act of January 21, 1903, his age, over fory-five years, precludes his own enlistment for military service against his will, and that even if it did not, he would be exempt under section 2 of this statute for the benefit of those "whose religious convictions are against war or participation therein."

The government's able brief cannot, says the petitioner, "escape the conclusion that the applicant is reserving to himself the right to determine in what manner he shall perform his duties of citizenship assumed by him,"—"it matters not whether a law of the United States be declared constitutional by the highest court of the land; from that decision he reserves the right of appeal to his own conscience." The district attorney contends, that "the very existence of a government carried on along these lines would be immediately imperiled. Refusal to perform either civil or military duties on a given day of the week because perchance a citizen entertained religious scruples about performing duties on that day would likewise justify a refusal of those duties on other days. Conditions would become chaotic. The government would soon come to depend on the mere whim of the individual members of that government."

In the petitioner's brief in reply to that of the district attorney, the question as to conflict of Sabbath-observance

with performance of civic duty, is now removed from the controversy by the unequivocal declaration, that "in a case where your petitioner should be called to sit on a jury, and the trial should run into Saturday, your petitioner, while regretting the necessity, would be willing to act as a juror on Saturday, as it would be necessary . . . within the rule taught by Christ when he gave the lesson of pulling the ox out of the ditch on the Sabbath." The only question remaining is, therefore, that of the conflict of scruples as to the taking of life, with the sworn duty of the citizen to "defend the Constitution against all enemies, foreign and domestic."

I must confess to a first impression of sympathy with the district attorney's argument, but with no disposition to criticise the petitioner for his scruples,—only an intellectual sympathy on purely technical grounds of principle. For there is weight in the consideration that he who desires the benefits of our Constitution should be ready to bear his share of all possible civic burdens. And the inclination was, to view the petitioner's case as one of misfortune, that he could not be both a good citizen and a good Christian at the same time, and to regard it as incumbent upon him to make his choice between two things, of which he could not consistently have both.

But Congress, in the statute cited in petitioner's behalf has granted an exemption to those who are already citizens, and so long as the statutes bear this declaration that such religious scruples are not deemed inconsistent with good citizenship, even though some others less scrupulous have to do any necessary fighting "for our altars and our fires," I do not feel that I should deny this application for admission to citizenship.

It seems inconsistent to seek citizenship in a country whose defense one is willing to leave to others in case of attack by "enemies, foreign or domestic." But Congress has clearly expressed its policy, and so long at least as those having the petitioner's scruples are so largely in the minor-

ity, I am not prepared to question, nor is it a judge's business to question, the policy of this legislation. And this policy is well established: the statute merely expresses a public sentiment which has been growing stronger ever since the case of Pringle. See Atlantic Monthly, February, 1913, vol. 111, page 145, title "The United States vs. Pringle: the Record of a Quaker Conscience." Wherefore, it is proper not to deny citizenship to one otherwise well qualified, as is this petitioner, simply because of something which is made a ground of exemption in case of those who are already citizens.

This decision is, of course, not based on the petitioner's claim of right to worship deity according to the dictates of his own conscience. For there is no such absolute, supreme, right under the Constitution. See Freund, Police Power, secs. 467-470.

Let the petition be granted.